# United States Court of Appeals for the Federal Circuit

---

**SHANXI HAIRUI TRADE CO., LTD., SHANXI PIONEER HARDWARE INDUSTRIAL CO., LTD., SHANXI YUCI BROAD WIRE PRODUCTS CO., LTD., DEZHOU HUALUDE HARDWARE PRODUCTS CO., LTD., XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,**
*Defendants-Appellees*

---

2021-2067, 2021-2068, 2021-2070

---

Appeals from the United States Court of International Trade in No. 1:19-cv-00072-LMG, Senior Judge Leo M. Gordon.

---

Decided: July 6, 2022

---

STEPHEN W. BROPHY, Husch Blackwell LLP, Washington, DC, argued for plaintiffs-appellants Shanxi Hairui Trade Co., Ltd., Shanxi Pioneer Hardware Industrial Co., Ltd., Shanxi Yuci Broad Wire Products Co., Ltd., Xi'An Metals & Minerals Import & Export Co., Ltd. Shanxi Hairui Trade Co., Ltd., Shanxi Pioneer Hardware

Industrial Co., Ltd., Shanxi Yuci Broad Wire Products Co., Ltd. also represented by JEFFREY S. NEELEY.

BRITTNEY RENEE POWELL, Fox Rothschild LLP, Washington, DC, argued for plaintiff-appellant Dezhou Hualude Hardware Products Co., Ltd.  Also represented by LIZBETH ROBIN LEVINSON, RONALD MARK WISLA.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, for plaintiff-appellant Xi'An Metals & Minerals Import & Export Co., Ltd.  Also represented by JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States.  Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, PATRICIA M. MCCARTHY; AYAT MUJAIS, International Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, argued for defendant-appellee Mid Continent Steel & Wire, Inc.  Also represented by LAUREN FRAID, JENNIFER MICHELE SMITH.

————————————

Before MOORE, *Chief Judge*, NEWMAN and STOLL, *Circuit Judges*.

MOORE, *Chief Judge*.

Appellants challenge two aspects of the Court of International Trade's decision affirming the Department of Commerce's ninth administrative review of its antidumping order regarding certain steel nails from China. *Shanxi Hairui Trade Co. v. United States*, 503 F. Supp. 3d 1307 (Ct. Int'l Trade 2021).  Shanxi Yuci Broad Wire Products Co., Shanxi Hairui Trade Co., Shanxi Pioneer Hardware

Industrial Co., (collectively, Shanxi) and Xi'an Metals & Minerals Import & Export Co. (Xi'an) appeal Commerce's calculation of the all-others rate applicable to separate-rate exporters. Dezhou Hualude Hardware Products Co. (Dezhou) and Xi'an appeal Commerce's application of partial adverse facts available (AFA) to Dezhou. For the following reasons, we affirm.

## BACKGROUND

In its ninth administrative review of its antidumping order regarding certain steel nails from China, Commerce relied on AFA in calculating antidumping rates for two mandatory respondents. For Shandong Dinglong Import & Export Co. (Shandong Dinglong), Commerce relied on total AFA to compute a rate of 118.04% because Shandong Dinglong did not cooperate at all with Commerce's investigation. For Dezhou, Commerce relied on partial AFA to compute a rate of 69.99% because it found that Dezhou's supplier engaged in a fraudulent transshipment scheme and that this misconduct was attributable to Dezhou.

Commerce then used those AFA-based rates to compute its all-others rate (i.e., the rate applied to all exporters of the subject merchandise who requested a separate rate but whom Commerce did not select as mandatory respondents). The Trade Court affirmed. Appellants appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We apply the same standard of review as the Trade Court, upholding determinations by Commerce that are supported by substantial evidence and otherwise in accordance with law. *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

Appellants challenge Commerce's determination of the all-others rate, arguing it was improper to base that rate in part on total AFA. Appellants further challenge

Commerce's determination of Dezhou's individual rate. They argue Dezhou's supplier did not engage in a fraudulent transshipment scheme, and, even if it did, such misconduct does not warrant the use of AFA against Dezhou. We affirm Commerce's determinations.

I

Ordinarily, Commerce determines an individual dumping margin for each known exporter of merchandise subject to antidumping duties. 19 U.S.C. § 1677f–1(c)(1). If, however, that is impracticable because there is a large number of exporters, Commerce may instead limit its examination to a subset of exporters it refers to as mandatory respondents. 19 U.S.C. § 1677f–1(c)(2). For exporters who are not examined, Commerce assigns an all-others dumping margin based on the margins Commerce determines for the mandatory respondents.

During an initial investigation, Commerce must generally set the all-others rate equal to the weighted average of the mandatory respondents' individual dumping margins, "*excluding any . . . margins determined entirely [on AFA]*." 19 U.S.C. § 1673d(c)(5)(A) (emphasis added). No such provision exists in the statutes governing administrative reviews, however. *See* 19 U.S.C. §§ 1675–1675c.

Here, Commerce interpreted the statutory scheme to permit the use of AFA-based margins to calculate the all-others rate in administrative reviews. We review Commerce's interpretation and application of statute under the two-step framework set forth in *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At *Chevron* step one, we determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear," we give effect to that intent. *Id.* at 842–43. But if "the statute is silent or ambiguous with respect to the specific issue," we proceed to step two of the *Chevron* framework, where we determine

"whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

A

At *Chevron* step one, we conclude that Congress has not directly spoken to whether Commerce may use AFA-based margins to compute all-others rates in administrative reviews. While § 1673d(c)(5)(A) expressly applies to investigations, the statute is silent with regard to administrative reviews and non-market economy (NME) exporters. *See* 19 U.S.C. § 1673d(c)(5)(A); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1377–78 (Fed. Cir. 2013) (recognizing that § 1673d does not apply to NME proceedings). Moreover, § 1673d(c)(5)(A) states that its restriction on using AFA-based margins is "[f]or purposes of *this subsection* and *section 1673b(d)* of this title." 19 U.S.C. § 1673d(c)(5)(A) (emphases added). Those sections concern determinations made during investigations, not administrative reviews. And the statute governing administrative reviews contains no such restriction. *See* 19 U.S.C. §§ 1675–1675c. By not extending § 1673d(c)(5)(A)'s restriction on using AFA-based margins to administrative reviews, Congress "left a gap for [Commerce] to fill." *See Chevron*, 467 U.S. at 843. Thus, under *Chevron* step one, we conclude that the statute is silent,[1] and we turn to *Chevron* step two to determine if the agency's gap filling is reasonable.

---

[1]    Appellants cite *Albemarle Corp. & Subsidiaries v. United States* in which we stated "the statutory framework contemplates that Commerce will employ the same methods for calculating a *separate* rate in periodic administrative reviews as it does in initial investigations." 821 F.3d 1345, 1352 (Fed. Cir. 2016). But *Albemarle* recognized that "§ 1673d applies on its face *only to investigations, not periodic administrative reviews*" and only to investigations

B

At *Chevron* step two, we ask whether Commerce reasonably filled the gap Congress left open as to the appropriate methodology for calculating the all-others rate in an administrative review. In answering that question, we recognize that Commerce is the "master of antidumping law" and has technical expertise in the "complex economic and accounting decisions" required in administering the statutory scheme. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (internal citation omitted). We therefore defer to its interpretation of the statute when implementing its antidumping duty methodology unless it is "arbitrary, capricious, or manifestly contrary to statute." *Id.* (quoting *Chevron*, 467 U.S. at 843–44). We also presume Commerce's methodology used in its calculations is correct. *Id.* (internal citation omitted). We conclude that Commerce's methodology for calculating the all-others rate was not contrary to statute and reasonable.

In 2013, Commerce promulgated a new policy for calculating all-others rates in administrative reviews for NME entities. Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings, 78 Fed. Reg. 65,963–64 (Nov. 4, 2013). Under the new policy, Commerce calculates the all-others rate based on the individual dumping margins not of the largest-volume exporters, as Commerce had historically done under § 1677f–1(c)(2)(B), but rather of a representative sample of exporters selected under § 1677f–1(c)(2)(A). Commerce explained that the largest-exporter

---

of companies in market economies. *Id.* at 1352 & n.6 (emphasis added). To the extent that our decision in *Albemarle* speaks at all to *Chevron* step one, it recognizes that the statute is silent.

method "effectively . . . excluded from individual examination" small-volume exporters, which "creates a potential enforcement concern . . . because, as exporters accounting for smaller volumes of subject merchandise become aware that they are effectively excluded from individual examination . . . , they may decide to lower their prices." *Id.* at 65,964. Commerce further explained that "[s]ampling such companies under section [1677f–1(c)(2)(A)] . . . address[es] this enforcement concern." *Id.*

Commerce's findings in the eight administrative reviews preceding the present one confirmed its enforcement concerns. Commerce consistently found that respondents other than Stanley, one of the largest exporters, "either obtained a much higher calculated margin, did not qualify for a separate rate, or were otherwise non-cooperative and received a margin based on total AFA." J.A. 393. Indeed, during those reviews, it calculated an average margin of 7.02% for Stanley and 105.71% for all other respondents. *Id.* That "large disparity," in Commerce's view, reinforced the need to follow the new policy and base the all-others rate on a representative sample of exporters, rather than the largest-volume exporters. *Id.* We cannot say that was unreasonable.

Nor can we say it was unreasonable for Commerce to rely on AFA-based margins in implementing the new policy. Commerce correctly noted that in other contexts the statutes it administers permit using AFA-based margins to calculate all-others rates. J.A. 395 (citing 19 U.S.C. § 1673d(c)(5)(B)). It also reasoned that "excluding AFA rates from the sample rate would give respondents the ability to manipulate the all[-]others rate," as evidenced by the large disparity between Stanley's 3.94% rate and the other mandatory respondents' rates. *Id.*; *see* J.A. 436. As mentioned, Commerce found in previous reviews that Stanley is not a representative exporter of the subject merchandise. And it reiterated that concern here. J.A. 397 ("Commerce finds that it is appropriate in this review to

include all rates to address concerns that the average . . . dumping margins for the largest exporter (i.e., Stanley) differs from the remaining exporters."). Under these circumstances, Commerce's use of AFA-based margins to calculate the all-others rate was reasonable.

*Albemarle* is also distinguishable at step two and does not control here. There, Commerce used data from a second review to impose an above de minimis margin to separate rate exporters in a third review despite Commerce's determination of de minimis margins for the mandatory respondents in the third review. 821 F.3d at 1353–56. We concluded that it was unreasonable to deviate from Congress' "preferred" method of calculating separate rates using contemporaneous de minimis rates where Commerce had "no evidence . . . that averaging the de minimis margins . . . in the third review . . . would not have been reflective of" the separate rate exporters. *Id* at 1354–56. In this case, Commerce has demonstrated that averaging the largest exporters and excluding AFA-based rates instead of sampling and including AFA-based rates would not be reflective of the economic realities of the export activity. Indeed, Commerce adopted a new sampling methodology because it found that smaller exporters were behaving differently than larger exporters and that AFA-based margins yield an all-others rate representative of the exporters as a whole. *See, e.g.*, J.A. 397. Therefore, Commerce's use of AFA here was reasonable based on the evidence that its method was reflective of the export behavior. *See Albemarle*, 821 F.3d at 1359 (explaining that Commerce could have deviated from de minimis method if it had "some evidence" that data from previous reviews continued to be reflective of current practices).

## II

We turn now to Commerce's use of partial AFA against Dezhou. Commerce found that Dezhou's supplier, Tianjin Lingyu (Lingyu), engaged in a fraudulent transshipment

scheme by falsely labeling the country of origin on its products. As a result, Commerce found that neither Lingyu nor Dezhou cooperated with the review and applied partial AFA in computing Dezhou's individual dumping margin under 19 U.S.C. § 1677e(a), (b). Appellants argue that Lingyu did not commit fraud and, even if it did, that Lingyu's conduct cannot be attributed to Dezhou for purposes of the dumping margin calculation. We conclude Commerce's finding that Lingyu engaged in a fraudulent transshipment scheme while in a significant supplier-customer relationship with Dezhou is supported by substantial evidence, and Commerce's calculation of Dezhou's dumping margin based on partial AFA is reasonable.

If Commerce finds that an exporter (1) provided information that cannot be verified or significantly impeded the examination, and (2) that exporter "failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may rely on AFA. 19 U.S.C. § 1677e(a)(2)(C)–(D), (b)(1)(A); *see Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1378–79 (Fed. Cir. 2016). Failing to cooperate may be found if the respondent fails "to do the *maximum* it is able to do." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added).

Substantial evidence supports Commerce's determination that Lingyu impeded a proceeding and provided unverifiable information, as well as failed to cooperate with the proceedings. During a verification tour of one of Lingyu's facilities, Commerce photographed boxes of nails destined for the United States mislabeled "[m]ade in Thailand." J.A. 365–69, 405. This is evidence of a fraudulent transshipment scheme, which supports Commerce's determination that Lingyu impeded the proceeding. *Papierfabrik*, 843 F.3d at 1379 (holding that evidence of transshipment scheme caused "omission that impeded investigation"). Further, the transshipment scheme directly undermines the reliability of *all* information Lingyu

provided to commerce regarding Dezhou so that it cannot be verified under 19 U.S.C. § 1677e(a)(2)(D).  *See Papierfabrik*, 843 F.3d at 1379 ("[F]raudulent responses as to *part* of submitted data may suffice to support a refusal by Commerce to rely on *any of that data* in calculating the antidumping duty." (emphases added)).

It was reasonable for Commerce to attribute Lingyu's transshipment fraud to Dezhou and determine that Dezhou failed to cooperate with Commerce because of their significant supplier-customer relationship.  *See Mueller Comercial de Mexico v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014) (holding that Commerce may attribute uncooperative supplier's conduct to cooperating respondent's dumping margins).  Based on sales data provided to Commerce, there is substantial evidence that Dezhou's purchases account "for a significant portion of . . . Lingyu's total production quantity"; and Lingyu's supply of nails accounts for a significant portion of Dezhou's sales.  J.A. 405.  And Commerce's conclusion that Dezhou did not cooperate to the best of its ability by failing to leverage its relationship with Lingyu to prevent transshipment fraud was not unreasonable.  *Mueller*, 753 F.3d at 1233; *see Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1356 (Fed. Cir. 2015) (affirming a determination that misrepresentations call into question accuracy of remaining information).  Indeed, Commerce's attribution of Lingyu's transshipment fraud to Dezhou, who is the party best suited to influence compliance, promotes Commerce's directive to remedy dumping harms and to protect the administrative process.  *See Mueller*, 753 F.3d at 1235.  In sum, substantial evidence supports Commerce's findings regarding Lingyu's conduct and its relationship to Dezhou.  And Commerce's partial-AFA determination for Dezhou's dumping margin based on those findings is reasonable.

## CONCLUSION

Commerce did not err. Commerce's use of AFA rates to determine the all-others rate was reasonable. And it reasonably applied partial-AFA rates to mandatory respondent Dezhou based on substantial evidence that Dezhou's supplier had engaged in a fraudulent transshipment scheme. We affirm the Court of International Trade's decision sustaining Commerce's dumping order.

## **AFFIRMED**

### COSTS

Appellants shall bear costs.